**DANCIGER et al. v. SMITH.** (No. 9454.)

(Court of Civil Appeals of Texas. Dallas. May 15, 1926. Rehearing Denied June 19, 1926.)

**1. Corporations ⬅503(1)—Corporation may be sued for commissions in county, where its broker found prospective purchaser on satisfactory terms (Rev. St. 1911, art. 1830, subds. 24, 28).**

Under Rev. St. 1911, art. 1830, subds. 24, 28, a corporation which agreed with plaintiff that, if he found a purchaser of its oil on satisfactory terms, they would pay him an agreed commission, may be sued in county wherein he found one who accepted terms, though corporation failed to execute the contract.

**2. Venue ⬅22(1)—One jointly liable with corporation may be sued with it, where venue may be laid as to it.**

An individual, sued with private corporation on joint contract made with plaintiff, might be sued in same county where corporation might be sued.

**3. Trial ⬅352(4)—That issue was submitted whether acts were ratified held not error, though not pleaded, where evidence showed acts were authorized.**

That issue whether defendants had ratified terms agreed on between one J. and purchaser found by plaintiff was submitted, though not pleaded, in action for commission for finding purchaser, *held* not error, being surplusage, in view of evidence that J. was authorized to act, and that subsequently defendants reached similar agreement.

**4. Brokers ⬅74—Judgment ⬅240—Property owners, negotiating with broker to secure purchaser and with purchaser without disclosing their respective interests, held jointly and severally liable for entire commission, and joint and several judgment proper.**

Where defendants negotiated as joint owners with plaintiff to find purchaser and, without disclosing their respective interests, contracted with purchaser found by plaintiff to sell property to them, their liability was joint and several, and joint and several judgment for entire commission was proper.

**5. Action ⬅60—Where, on motion for severance, cause was ordered docketed separately against different defendants, final judgment in one of the separate suits held proper, without disposing of other.**

Where, after sustaining abatement plea for misjoinder, court, on motion for severance, ordered cause docketed separately against different defendants and to proceed as separate suits, final judgment in one, without disposing of other, *held* proper, in absence of showing that defendants therein excepted to order, or had suffered injury therefrom.

**6. Abatement and revival ⬅43—Rights of assignees of claim involved in suit previously instituted by assignor to have suit prosecuted in assignor's name held unaffected by his subsequent adjudication in bankruptcy.**

Where plaintiff assigned claim involved in suit instituted by him to creditors, and obligated himself to prosecute suit in his name and account to assignees, and thereafter was adjudicated bankrupt, *held* such adjudication could not affect validity of assignments, nor right of assignees to have suit prosecuted in assignor's name.

**7. Bankruptcy ⬅156.**

A trustee cannot intervene in suit previously brought by bankrupt, except with approval and an order of the bankruptcy court, in view of Bankruptcy Act, § 11, subd. c (Comp. St. § 9595).

**8. Abatement and revival ⬅43—Bankruptcy adjudication against bankrupt, who scheduled no assets, and discharge without appointment of trustee, held not to abate suit previously brought by him (Bankruptcy Act, § 2, subd. 8 [Comp. St. § 9586]).**

That, subsequent to instituting suit to recover alleged indebtedness, plaintiff was adjudicated a bankrupt, and scheduled no assets, no trustee was appointed, and he was discharged, did not abate suit, in view of Bankruptcy Act § 2, subd. 8 (Comp. St. § 9586), and fact that defendants were not interested parties who would be benefited by reopening estate.

**9. Bankruptcy ⬅372.**

Discovery of unadministered assets is ground for reopening bankrupt estate.

**10. Bankruptcy ⬅372.**

Application for reopening estate must be made by some interested party, who will be benefited by the reopening.

**11. Appeal and error ⬅930(1).**

Court of Civil Appeals must adopt view of evidence most favorable to appellee in support of findings of jury and the judgment.

**12. Brokers ⬅64(1)—Broker, employed to find purchaser, held entitled to commission, when purchaser and seller agreed on terms, though no sale was consummated, because purchaser was unable to comply with subsequent modified agreement.**

Where purchaser found by plaintiff and seller agreed on terms, plaintiff *held* entitled to commission though purchaser and seller subsequently agreed to modifications, and, because of inability of purchaser to comply with modifications, no sale was consummated.

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Action by N. K. Smith against M. O. Danciger and another. Judgment for plaintiff, and defendants appeal. Affirmed.

Wallace & Taylor and Carden, Starling, Carden & Hemphill, all of Dallas, for appellants.

Jed. C. Adams and Charles A. Rasbury, both of Dallas, for appellee.

LOONEY, J. This suit as originally brought was against appellants and the Oriental Oil Company of Dallas. Appellee's al-

legations are, in substance, that he arranged with the Oriental Oil Company to assist it in procuring crude oil for its refineries with the understanding that, if he procured production in the amount desired and on terms satisfactory, the company would purchase the same, conditioned, however, that appellee would collect commissions from the seller.

In accordance with this understanding, appellee began negotiations with appellants, who represented that they owned, jointly, certain leases producing oil that were for sale, and agreed with appellee that, if he found a purchaser on terms satisfactory, they would pay him a commission of 5 per cent. on the amount of the purchase price. This employment was accepted and the Oriental Oil Company was solicited by appellee as a prospective purchaser. The parties were brought together, an agreement was reached, whereby appellants were to sell and the Oriental Oil Company was to purchase on terms mutually satisfactory.

It was understood that each producing well should be subjected to a capacity flow for a period of five days, the production to be measured by barrels and the gross amount divided by 5, the quotient to represent the average daily production, which, when thus ascertained, was to be multiplied by 300 and the result thus reached was to express the consideration in dollars to be paid for the lease and the wells. The purchase price was to be paid part in cash and part by the negotiable notes of the Oriental Oil Company and, as an earnest of its good faith, it was required to deposit the equivalent of $100,000 in a bank at Wichita Falls.

Appellee alleged that this agreement was never consummated; that appellants insisted they were not at fault, but at all times were ready and willing to consummate the sale on the terms agreed to, but that the Oriental Oil Company was responsible for the failure of the trade to go through. The Oriental Oil Company, however, claimed that appellants were entirely at fault; that it was at all times ready, able, and willing to consummate the sale according to the agreement, but that appellants sold the lease and production to another party on more favorable terms.

Appellee contended that, if appellants breached the contract, he was entitled to recover the agreed commission, but, if the facts developed that the Oriental Oil Company breached the contract, thereby preventing him from securing commissions from the sellers, he was entitled to damages from the latter for the reasonable value of his services, which he placed at any amount equal to the commission he would have earned from the sellers.

Appellants filed pleas of privilege to be sued in Wichita county, Tex. These pleas were controverted by appellee and, on hearing were overruled and, on appeal from said order, the judgment of the trial court was affirmed. See (Tex. Civ. App.) 229 S. W. 909.

After the case was returned, the court sustained pleas of misjoinder, holding that the cause of action pleaded against appellants and the Oriental Oil Company were not joint, but separate and distinct, and, in response to the ruling of the court in this respect, appellee filed a motion for severance, requesting that the clerk be required to docket the suit separately against appellants and against the Oriental Oil Company. This motion was sustained and the clerk was directed to docket the case accordingly. Thereafter appellee amended, naming appellants only as defendants, and thereupon they again urged their plea of privilege as originally filed, which was again overruled, and the case proceeded to trial and was submitted to a jury upon special issues.

The findings of the jury were, in our opinion, sustained by the evidence and are adopted as our conclusions as to the facts as far as they go. They are, substantially, that appellants employed appellee to act for them in the sale of a 20-acre oil lease with certain producing and unfinished wells thereon, described in the petition of appellee, and agreed to pay him for his services 5 per cent., based on the amount of the sale price; that appellee procured the Oriental Oil Company as a purchaser, with whom appellants agreed on the terms of sale affected in certain telephone conversations between appellee and one Joe Danciger, a brother of appellant M. O. Danciger; that the Oriental Oil Company was ready, able, and willing to purchase the properties on the terms authorized by appellants; that, after the agreement of sale was made, appellants required of the Oriental Oil Company other and different conditions before they would sign the contract, which additional conditions were agreed to by the Oriental Oil Company, and thereafter it was ready, able, and willing to execute the contract as changed; that appellants refused to execute the contract, both as originally made and as later changed, and were responsible for the failure of the sale. The jury also found that the average daily production of the wells on the lease was 4,000 barrels. On these findings judgment was rendered for appellee against appellants, jointly and severally, for the sum of $60,000; that being the result of multiplying 4,000, the average daily output of the wells in barrels by $300, the agreed price per barrel. From the judgment rendered this appeal is prosecuted.

We will not undertake to discuss all, but only the questions that we deem necessary to a proper disposition of the cause.

[1, 2] 1. Appellants insist that the filing of the amended petition by appellee after the order of severance was entered, entitled them to again present their pleas of privilege. This was done, and the pleas were

again overruled. Error is assigned on this action of the court.

We cannot adopt the view that the court erred; in fact, the question presented for review was adjudicated adversely to appellants on the former appeal. Two questions were discussed by the court: The first was whether the fact that the Oriental Oil Company was a resident of Dallas county justified the bringing of the suit against appellants there under subdivision 4 of article 1830, Rev. St. 1911. The court held that this could not be done, for the reason that the cause of action stated against the Oriental Oil Company was separate and not joint against the several defendants. The court, however, held that venue in Dallas county existed under subdivisions 24 and 28 of article 1830, Rev. St. 1911, in that the cause of action, or a part thereof, against the Emerich Oil Company, a corporation, arose or accrued in Dallas county, and that M. O. Danciger could be sued on the joint contract in the same county.

The facts upon which the court found that venue in the first instance was properly laid in Dallas county are resident and as vital in the case after the severance as they were before. We therefore overrule this assignment.

2. Appellants contend that, at the time appellee rendered the service in regard to the sale of the oil lease, and at the time he was employed by them, he was secretly in the employ of the Oriental Oil Company, the purchaser, and, as a consequence, is prohibited from recovering under the familiar rule that an agent cannot serve the buyer and seller and be entitled to a commission from the seller, except where his status is known and consented to by the seller at the time the latter avails himself of the services of the agent. The evidence, in our opinion, does not raise the issue of a dual agency or invoke the principle of law insisted upon. We therefore overrule this contention.

[3] 3. It is further contended by appellants that, as ratification of the acts of Joe Danciger touching the sale of the properties was not pleaded by appellees, that issue should not have been submitted to the jury. In special issue No. 7 the court inquired of the jury whether or not appellants agreed to and ratified the acts, conduct, representations, and statements of Joe Danciger touching the sale of the property to the Oriental Oil Company made in certain telephone conversations with appellee on May 17, 1920. The cause of action alleged was not based on the theory of a subsequent ratification by appellants of the unauthorized acts of Joe Danciger, but was predicated on the idea that Joe Danciger was authorized to act for them in consummating the agreement to sell.

In response to other special issues the jury found that appellant agreed to the terms of the sale of the properties in certain telephone conversations between appellee and Joe Danciger. The evidence was sufficient to show that appellants owned the properties jointly, and acted jointly in negotiating the sale, and that Joe Danciger was authorized to represent them in these negotiations.

If any doubt on this point existed otherwise, it was dissipated by the subsequent conduct of the parties. On May 18, 1920, the parties met in the office of the Emerich Oil Company in Wichita Falls for the purpose of reducing to writing the agreement reached the day preceding by Joe Danciger, speaking over the telephone for appellants, and appellee, speaking for the Oriental Oil Company. At this meeting Mr. Emerich called on Joe Danciger to state his understanding of the agreement thus reached, and he, in turn, requested appellee to make the statement, which he thereupon proceeded to do. No objection was made by anyone to the version of the agreement as stated by appellee; in fact, when he finished, Mr. Emerich remarked that it was unusual for men to get so close together on a deal of the magnitude and character of the one being thus handled.

In view of what transpired at this meeting in connection with other evidence, it is apparent that Joe Danciger was authorized to act for appellants in the negotiations over the telephone that resulted in the agreement to sell on the part of appellants and to purchase on the part of the Oriental Oil Company. However, whether this conclusion is justified or not, the evidence shows that such an agreement was then reached by and between the parties, all of whom were present and acting for themselves.

It is our opinion that the special issue submitted on ratification was useless and may be treated as surplusage. We therefore overrule appellants' assignment in regard to this matter.

[4] 4. The contention is made that the judgment should not have been joint and several for the entire commission, for the reason that it was not made to appear that appellants were partners. This contention is not well taken, in our opinion, for the reason that appellants negotiated with appellees as joint owners of the properties and, as such, without disclosing their respective interests, contracted with the Oriental Oil Company to sell the lease and its production, and are therefore separately and jointly liable for the entire commission.

[5] 5. It is contended, further, that the court was without power to enter a final judgment because one of the defendants, the Oriental Oil Company, was not finally disposed of. This contention is without merit.

The trial court sustained a plea in abatement by reason of the misjoinder of the Oriental Oil Company as a party defendant. Thereupon appellee filed a motion for severance, requesting the court to order the clerk

to docket the suit separately against appellants and the Oriental Oil Company. This motion was sustained and the court directed the clerk to docket the cause "independently and separately against the defendant Oriental Oil Company, on one hand, and against the defendants M. O. Danciger and Emerich Oil Company, jointly, on the other, and that both of said causes would proceed finally to trial as separate and independent suits." After the severance, this branch of the suit proceeded against appellants as a separate suit. It does not appear that appellants excepted to the order of the court nor is it made to appear that they suffered any injury therefrom.

6. Appellants assign error on the refusal of the court, at their request, to direct a verdict in their favor, for the reason that, after the institution of the suit, appellee filed a voluntary petition in bankruptcy, in which 'he scheduled no assets and made no mention of the claim involved in this suit, although he was then owner, notwithstanding the fact that, after filing the suit and before the bankruptcy proceedings, he had assigned the same as security for pre-existing indebtedness, and, further, that it did not appear that the assignments were accepted by the creditor in whose favor they were made.

The facts bearing on this assignment, chronologically stated, are as follows: This suit was instituted on June 22, 1920. It appears that appellee assigned one-third of his claim, $20,000, to his attorneys, and the remaining two-thirds was assigned as follows: On August 14, 1920, an assignment was made in writing, absolute in form, to J. B. Cranfill of a one-third interest in the remainder of the claim, and, in like manner, on August 15, 1920, he made a written assignment to Mrs. Hutchinson of the remaining interest in the claim, and in each of these written assignments he obligated himself to prosecute the suit in his own name and account to the assignees for the proceeds derived therefrom. These assignments were made in consideration of debts held by the assignees respectively against appellee, and it appears from recitals that the assignments were executed in accordance with prior agreements between appellee and the assignees.

Appellee was adjudged a bankrupt on June 17, 1921. No assets were scheduled by him, and no mention was made of the claim in suit. This omission was on the advice of his attorney, to the effect that, in the status of the matter, it was not necessary to either schedule or mention the claim. No trustee was appointed by the bankrupt court for his estate, and appellee was granted a discharge on September 23, 1921. The pleadings of appellants, alleging the failure of appellee to schedule the claim in suit, and attacking the sufficiency and validity of the assignments, were not filed until May 21, 1924.

[6] In considering this matter, we do not find it necessary to determine the question as to whether there remained in appellee an equitable interest in the claim after he made the assignments hereinbefore mentioned, for, even admitting that such an interest did remain, still his being adjudicated a bankrupt could not affect the validity of the assignments, nor the right of the assignees to have the suit prosecuted in his name. 5 C. J. p. 985, § 183.

[7] The suit did not abate by reason of the bankruptcy proceedings, nor could a trustee, if one had been appointed, have intervened, except with the approval and on order of the bankruptcy court. Subdivision C of section 11, Bankrupt Act (Comp. St. § 9595) makes provisions for such a situation as follows:

"A trustee may, with the approval of the court, be permitted to prosecute as trustee any suit commenced by the bankrupt prior to the adjudication, with like force and effect as though it had been commenced by him."

[8] It follows, therefore, that, even if the suit had been prosecuted by appellee in his own right, as no trustee was appointed, presumably for good and sufficient reasons appearing to the court, appellants would not thereby have been discharged. Griffin v. Mutual Life Ins. Co., 119 Ga. 664, 46 S. E. 870, 11 Am. Bankr. Rep. 622; Hahlo v. Cole, 112 App. Div. 636, 98 N. Y. S. 1049, 15 Am. Bankr. Rep. 591; 1 Collier on Bankruptcy, p. 285.

In no event, under purview of the law, would failure of appellee to schedule the claim in the bankruptcy proceedings discharge the liability of appellants, or constitute a bar to this action. If there remained in appellee any equitable interest in the claim, it passed constructively into the custody of the bankruptcy court when he was adjudicated a bankrupt, to be administered for the benefit of his creditors. That court, for reasons which we have no right to scrutinize, failed to appoint a trustee and, later, closed the estate and discharged appellee.

If, as insisted, appellee owned an interest in the claim at the time of his adjudication, the court of bankruptcy is not without ample jurisdiction to administer the asset for the benefit of the creditors of his estate. These courts are clothed with jurisdiction, among other things (section 2, subd. 8, Bankruptcy Act [Comp. St. § 9586]):

To "close estates, whenever it appears that they have been fully administered, by approving the final accounts and discharging the trustees, and reopen them whenever it appears they were closed before being fully administered."

[9, 10] One of the common grounds for reopening estates is the discovery of unadministered assets. In such event, however, application to reopen must be made by some interested party who will be benefited by the reopening. 1 Collier (12th Ed.) p. 73; In

re Shaffer (D. C.) 104 F. 982; In re Paine (D. C.) 127 F. 246; In re Meyer (D. C.) 181 F. 904; In re Greff, 250 F. 997, 163 C. C. A. 247; In re Levy (D. C.) 259 F. 314; Pollack v. Meyer Bros. Drug Co., 233 F. 861, 147 C. C. A. 535.

We will not speculate as to the action the court of bankruptcy might take, should an application to reopen be made by an interested party, but, of this we are convinced, that appellants are not interested parties within the meaning of the law and cannot successfully plead in bar to this action the failure of appellee to schedule the claim, even though it be conceded that he owned a beneficial interest therein at the time of the adjudication.

7. Appellants insist further that the court should have given the peremptory instruction in their favor, for the reason that, after the negotiations over the telephone, appellee participated in and consented to further negotiations, resulting in an agreement to the effect that the directors of the Oriental Oil Company would sign, as sureties, the notes of the company representing the deferred payments, and that there is no evidence that the company was ever able to procure or tender the notes with the obligation of these directors as sureties.

[11] In support of the findings of the jury and the judgment of the court, we must adopt the view of the evidence most favorable to the contentions of appellee, which, in our opinion, does not support the claim that appellee consented to any modification of the agreement reached over the telephone; to the contrary, it is to the effect that he protested these changes. They were consented to, however, by the officers of the Oriental Oil Company. It seems that on the morning after the negotiations over the telephone, when the parties assembled in the office of Mr. Emerich at Wichita Falls for the purpose of reducing the telephone agreement to writing, Joe Danciger, with whom appellee had the telephone conversations, was requested by Emerich to state the agreement as he understood it, and he, in turn, requested appellee to make the statement. The statement of the agreement then made by appellee is precisely as contended for by him, and, being acquiesced in by the parties, Mr. Hunter, an attorney, was called in for the purpose of drafting the contract. On this point, appellee testified as follows:

"Mr. Hunter dictated this contract and about the time we were finishing the description of the notes in the contract Mr. Emrich said: 'The directors of your company will sign these notes?' And I spoke up and said: 'No; you were to take my trade with Danciger; you were to take the obligation of the Oriental Oil Company on the deferred payments.' 'Now,' he said, 'we would not sell this property if we did not need the money and we are selling it only to raise money. We have got to have the money.' I

was out of it then and he and Mr. Smith (W. R. Smith of the Oriental Oil Company) and Mr. Munger (a director) discussed it for a few minutes, and they agreed to sign the notes, so the contract was completed."

[12] If this were a damage suit by the Oriental Oil Company against appellants, or for specific performance, the question as to whether or not it was able and willing to procure or tender the notes with the obligation of its directors as sureties could be raised with propriety; but, as appellee earned his commission before the modifications were agreed to by the officers of the Oriental Oil Company, and being in addition to the terms on which he was authorized to sell the property, his rights were not affected thereby. It follows, therefore, that whether or not the Oriental Oil Company was able to procure or tender notes signed by its directors as sureties was an immaterial inquiry. Hassell v. Gamble (Tex. Civ. App.) 263 S. W. 936.

8. Appellants have presented for our consideration numerous assignments based on alleged errors of the court in refusing requested instructions, in charging on the weight of the evidence, failure to define certain terms employed in the charge, and for multifariousness, etc., all of which, after careful consideration, are overruled in common with the assignments discussed, and the case will be affirmed.

Affirmed.